UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PACIFIC NORTHWEST EB-5 REGIONAL CENTER, et al., | CASE NO. C25-0597-KKE |
| Plaintiff(s), | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |
| v. | |
| KRISTI NOEM, et al., | |
| Defendant(s). | |

Michelle Darnbrough is an immigrant investor whose visa petition was revoked by the United States Citizenship and Immigration Services ("USCIS") in April 2025. Plaintiffs[1] contend that USCIS's reasons for revoking Darnbrough's petition amounts to a new rule that is inconsistent with longstanding prior agency policy and was applied in violation of the Administrative Procedure Act ("APA"). Dkt. No. 9.[2] The Government[3] filed a motion to dismiss, contending

---

[1] Plaintiffs are a group of business entities and individuals: the individuals are Darnbrough and her immediate family members and the entities that Darnbrough directly or indirectly invested in.

[2] This order refers to documents on the docket by CM/ECF page number. To account for the numbering regimen of the first amended complaint (Dkt. No. 9), this order will refer to paragraphs in that document by page number as well as paragraph number.

[3] This order collectively refers to Defendants — the Secretary of the United States Department of Homeland Security, the Acting Director of the United States Citizenship and Immigration Services ("USCIS"), and the Chief of USCIS's Immigrant Investor Program Office — as "the Government."

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 1

that because Darnbrough's administrative appeal of her visa revocation is ongoing, the Court cannot review USCIS's reasons for revoking Darnbrough's visa at this time. Dkt. No. 13.

The Government's arguments are persuasive. Because the Court finds that Plaintiffs' claims challenge a "rule" enacted in the context of an individual adjudication, Darnbrough's failure to exhaust her administrative remedies with respect to that adjudication is fatal to those claims. Accordingly, the Government's motion to dismiss will be granted, and the complaint is dismissed without prejudice and without leave to amend for failure to exhaust.

## I.  BACKGROUND[4]

The Immigration Act of 1990 created a new preference allocation of visas ("EB-5" visas) for immigrants who have invested, or are in the process of investing, a designated amount of lawfully obtained capital in a new commercial enterprise ("NCE"), if that investment will create at least 10 jobs for qualified United States workers. *See* 8 U.S.C. § 1153(b)(5). An investor who is granted an EB-5 visa may obtain lawful permanent resident status for themselves and their immediate family. Dkt. No. 9 at 7 ¶ 12. To qualify for an EB-5 visa, a foreign national must invest or be in the process of investing $1 million, but if the investment is made in a "targeted employment area" ("TEA"), then the minimum investment amount is reduced to $500,000. 8 U.S.C § 1153(b)(5) (2019); 8 C.F.R. § 204.6(f)(2) (2019).[5] A TEA is "an area that, at the time of investment, is a rural area or is designated as an area that has experienced unemployment of at least 150 percent of the national average rate." 8 C.F.R. § 204.6(e).

---

[4] For purposes of resolving the motion to dismiss, the Court assumes the facts alleged in the operative complaint are true. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Thus, this section is largely taken from Plaintiffs' first amended complaint. Dkt. No. 9.

[5] The 2019 monetary thresholds are referenced here because they were in effect at the time that Darnbrough's visa petition was filed. *See* Dkt. No. 9 at 13 ¶ 43. The monetary thresholds have increased since the time period relevant to this case: the general minimum investment required is now $1,050,000, with a reduction to $800,000 if the NCE is located in a TEA or in an infrastructure project. *See* 8 U.S.C. § 1153(b)(5)(A) and (C).

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 2

In 1992, Congress expanded the EB-5 visa program via "regional centers," which are entities organized for the promotion of economic growth. *See* 8 C.F.R. § 204.6(m). To obtain a designation as a regional center, an economic entity must demonstrate that it will promote economic growth and create jobs. *Id*. § 204.6(m)(3)(i)–(v). USCIS reviews applications for designation as a regional center. Dkt. No. 9 at 8 ¶ 17. After USCIS approves a regional center designation application, the regional center is then authorized to sponsor job-creating EB-5 projects and to recruit foreign investors to contribute capital to those projects. *Id*. at 8 ¶ 19. Individual investors in a project sponsored by a regional center may receive credit for jobs generated indirectly as a result of their investments. 8 C.F.R. § 204.6(g), (j). In order to obtain lawful permanent resident status via the EB-5 visa program, the immigrant investor must file an Immigrant Petition by Alien Entrepreneur on Form I-526 with USCIS, and must demonstrate eligibility both at the time of filing and at the time of USCIS adjudication. *Id*. §§ 103.2(b)(1), 204.6(a).

In 2022, the EB-5 regional center program was modified via the EB-5 Reform and Integrity Act ("RIA"), 8 U.S.C. § 1153. The RIA imposed new reporting and eligibility requirements on regional centers as well as their investors, designed to "strengthen oversight and combat fraud." *Behring Regional Ctr. LLC v. Mayorkas*, No. 22-cv-02487-VC, 2022 WL 2290594, at *2 (N.D. Cal. June 24, 2022). The RIA also includes an exhaustion requirement for judicial review of EB-5 determinations, indicating that with few exceptions, "no court shall have jurisdiction to review a determination under this paragraph until the regional center, its associated entities, or the alien investor has exhausted all administrative appeals." 8 U.S.C. §1153(b)(5)(P)(ii).

In this case, Plaintiff Pacific Northwest EB-5 Regional Center ("Pacific Northwest RC") is a nonprofit entity created in 1991 and its application for regional center designation was approved in 2013. Dkt. No. 9 at 9 ¶ 23, 10 ¶ 29. Pacific Northwest RC sponsors NCEs that create

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 3

jobs by helping truck drivers purchase environmentally compliant trucks, using capital contributed by EB-5 visa investors. *Id*. at 2 ¶ 6. The truck drivers then become members of an NCE, Plaintiff Green Truck IX Limited Partnership, which is associated with Pacific Northwest RC. *Id*. at 2 ¶ 6, 5 ¶ 2. Green Truck Fleet members haul freight throughout a designated five-state region (Washington, Idaho, Montana, Oregon, and California), although Pacific Northwest RC and the NCEs it sponsors are headquartered in the Port of Bellingham, Washington. *Id*. at 2 ¶¶ 5, 7; 3 ¶ 8. In the regional center designation letter, USCIS found that Pacific Northwest RC

> will principally be doing business within a TEA …. However, investors with related Form I-526 petitions must establish that at the time of investment or at the time of filing the immigrant petition, as applicable, the geographic area in question qualified as a TEA. A geographic area that once qualified as a TEA may no longer qualify as employment rates or population increases over time.

*Id*. at 11 ¶ 33. As recently as 2018, USCIS confirmed that the Port of Bellingham satisfies the definition of a TEA and that Pacific Northwest RC investments qualify as "within a TEA" because it "principally does business in a TEA." *Id*. at 3 ¶¶ 11, 13. According to Plaintiffs' complaint, USCIS recently began requiring that the "job-creating entity" ("JCE") that receives the investor's funding must principally conduct business from a fixed address within a TEA in order for an investor to claim credit for the job creation; that the regional center is headquartered in a TEA is no longer sufficient. *Id*. at 3 ¶ 15. Plaintiffs contend that USCIS is currently imposing this requirement (which they call "the JCE/TEA Rule") in adjudicating visa petitions, which "will drive Pacific Northwest RC and the new commercial enterprises it sponsors out of business." *Id*. at 4 ¶ 17. Presumably because long-haul truck drivers do not confine their work travel to within a TEA,

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 4

USCIS will no longer count the creation of the driver jobs toward the job-creation requirement of an EB-5 visa.[6]  *See, e.g.*, Dkt. No. 10-4 at 5.

Specifically, Plaintiffs contend that individual investors, including Darnbrough and her family, will be deprived of the opportunity to immigrate to the United States via an EB-5 visa, despite having already made a $500,000 investment to Pacific Northwest RC in 2019.  Dkt. No. 9 at 4 ¶ 19.  After Darnbrough filed her Form I-526 petition, USCIS issued a notice of intent to deny Darnbrough's petition in 2023, asking her for additional documentation and explanation of her eligibility.  *Id*. at 13 ¶ 44.  Darnbrough timely responded to that notice with evidence.  *Id*. at 13 ¶ 45.  In 2024, USCIS again issued a notice of intent to deny Darnbrough's petition, stating:

> The job creation model utilizes revenue from jobs that are not created within the TEA, as discussed above.  In order for the investor to obtain credit for the investment's job creation, the economic model must reasonably show that the activities occur in the area described.  However, the jobs are not created at the address stated.  The revenue used as the model's input is not created at the site.  The petitioner has failed to substantiate the job creation is being calculated reasonably, as prescribed 8 C.F.R. § 204.6(m)(1), (7).

*Id*. at 13 ¶ 48.  Darnbrough timely responded to the notice, explaining her disagreement with USCIS's position.  *Id*. at 14 ¶ 50.  USCIS then approved Darnbrough's petition on January 22, 2025, but issued a notice of intent to revoke ("NOIR") the approved petition on March 4, 2025, claiming that Darnbrough's petition had been approved erroneously and should have been denied for the reasons outlined in the earlier notice of intent to deny.  *Id*. at 14 ¶¶ 51–54.  Darnbrough filed this action on April 3, 2025, and the next day responded to the NOIR.  *Id*. at 14 ¶ 56.  USCIS

---

[6] Without a full administrative record including the documents that Darnbrough submitted to USCIS along with her visa petition, the Court must infer what was found lacking from the exhibits attached to Plaintiff's motion for preliminary injunction, including USCIS decisions.  *See* Dkt. Nos. 10-1, 10-2, 10-3, 10-4, 10-5, 10-6, 10-7, 10-8, 10-9.  The Court finds that the exhibits attached to Plaintiffs' motion for preliminary injunction (*id*.) are incorporated by reference for purposes of resolving the motion to dismiss because they are quoted, cited, or referenced therein.  *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003) (explaining that a court may consider documents incorporated by reference in the complaint or matters of judicial notice, without converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment).

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 5

issued a decision revoking approval dated April 23, 2025 (*id*. at 14 ¶ 57) and Plaintiffs subsequently amended their complaint to reflect this decision. *See* Dkt. No. 9. Darnbrough is aware that USCIS has denied I-526 visa petitions filed by four other investors, for the same reasons USCIS provided in her revocation letter. *Id*. at 14 ¶ 59.

Plaintiffs' operative complaint contends that the JCE/TEA Rule constitutes arbitrary and capricious agency action that is inconsistent with the INA. Dkt. No. 9 at 16–18. Plaintiffs also claim that USCIS adopted the JCE/TEA Rule without abiding by the notice and comment procedures required by the APA, and that USCIS impermissibly applies the new rule retroactively to petitions filed before the new rule was adopted. *Id*. at 18–19. Plaintiffs request, via various pathways, that the Court set aside the JCE/TEA Rule, enjoin its application to any petition filed before 2024, and equitably estop USCIS from applying it to revoke Darnbrough's petition. *See id*. at 22.

Plaintiffs filed a motion for preliminary injunction, and the Government opposed that motion and filed a motion to dismiss for failure to state a claim. Dkt. Nos. 10, 13. The Court heard oral argument on both motions, and the motions are ripe for resolution.

## II.   ANALYSIS

**A.   Legal Standards**

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court examines the complaint to determine whether, if the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**B.   Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted at This Time.**

Plaintiffs' complaint cites to the USCIS rationale for denying Darnbrough's visa petition and characterizes it as the content of the JCE/TEA Rule challenged in this lawsuit. *See* Dkt. No. 9 at 13–14. Plaintiffs contend that "[a]t least four other investors in NCEs sponsored by Pacific Northwest RC" have also received visa petition denials "based on the JCE/TEA Rule." *Id*. ¶ 59.

The Government argues that because Plaintiffs' challenged "rule" has been articulated only in agency decisions addressing individual visa petitions, that rule cannot be characterized as a "legislative" rule subject to judicial review under the APA. Dkt. No. 13 at 10–13. According to Defendants, the JCE/TEA Rule is not actually a "rule" at all, because it does not have the force of law, but merely represents an interpretation of the regulations that USCIS has recently applied to a handful of visa petitions. *Id*. at 13.

Plaintiffs disagree, contending that when USCIS abruptly, without explanation, interprets longstanding regulations in a manner contrary to its prior practice with respect to individual petitions, such an about-face can rise to the level of a "legislative" rule subject to judicial review. Dkt. No. 19 at 8. Plaintiffs also argue in the alternative that if the JCE/TEA Rule is properly characterized as "interpretive" rather than "legislative," some of Plaintiffs' claims (such as the claim for impermissible retroactive application) would nonetheless survive the Government's motion. *Id*. at 17–18.

For the following reasons, the Court agrees with the Government that the agency action challenged in this suit is not reviewable regardless of whether the JCE/TEA Rule is considered legislative or interpretive.

*1. The Court Need Not Determine Whether the JCE/TEA Rule is Legislative or Interpretive.*

The Court of Appeals for the Ninth Circuit has explained the difference between a legislative agency rule and an interpretive agency rule:

> An agency can issue a legislative rule only by using the notice and comment procedure described in the APA, unless it publishes a specific finding of good cause documenting why such procedures "are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b), (b)(B). In contrast, an agency need not follow the notice and comment procedure to issue an interpretive rule. § 553(b)(A).
>
> …
>
> In general terms, interpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule. *Yesler Terrace Community Council v. Cisneros,* 37 F.3d 442, 449 (9th Cir. 1994). Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress. *Id.*

*Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). Plaintiffs' complaint does not explicitly define the JCE/TEA Rule as either legislative or interpretive, but because they complain that USCIS did not comply with the notice and comment procedure required by the APA (Dkt. No. 9 at 18 ¶¶ 84–86), it seems to assume that the rule is legislative.

The Government's motion to dismiss disputes that central assumption, contending that there has been no change in the law that would be consistent with a new legislative rule. The USCIS notices and letters that Darnbrough received, as quoted in the first amended complaint, cite to a regulation substantively unchanged since 1991. Dkt. No. 13 at 7, 10; *see also* Dkt. No. 10-3 at 2–8, Dkt. No. 10-4 at 2–6, Dkt. No. 10-6 at 2–6, Dkt. No. 10-7 at 3–11. The Government also cites a 2013 USCIS policy memorandum that explains how to determine whether a JCE is within a TEA, and again emphasizes that this policy has not changed since its inception. Dkt. No. 13 at 9–10 (citing USCIS Policy Memorandum PM-602-0083 at 6–8, *available at*

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 8

https://www.uscis.gov/sites/default/files/document/memos/EB-5%20Policy%20Memo%205-30-13.pdf (last visited Sep. 11, 2025)). In most relevant part, that memo provides:

> Congress expressly provided for a reduced investment amount in a rural area or an area of high unemployment in order to spur immigrants to invest in new commercial enterprises that are principally doing business in, and creating jobs in, areas of greatest need. In order for the lower capital investment amount of $500,000 to apply, the new commercial enterprise into which the immigrant invests or the actual job creating entity must be principally doing business in the targeted employment area.
>
> For the purpose of the EB-5 Program, a new commercial enterprise is "principally doing business" in the location where it regularly, systematically, and continuously provides goods or services that support job creation. If the new commercial enterprise provides such goods or services in more than one location, it will be deemed to be "principally doing business" in the location that is most significantly related to the job creation. Factors to be considered in making this determination may include, but are not limited to, (1) the location of any jobs directly created by the new commercial enterprise; (2) the location of any expenditure of capital related to the creation of jobs; (3) where the new commercial enterprise conducts its day-to-day operation; and (4) where the new commercial enterprise maintains its assets that are utilized in the creation of jobs. *Matter of Izummi*, 22 I&N Dec. at 174.

USCIS Policy Memorandum PM-602-0083 at 7. Because the sources that set forth the principles that Plaintiffs refer to as "the JCE/TEA Rule" have been in place for "well over the six-year APA statute of limitations[,]" the Government contends that Plaintiffs have failed to state a claim because the "rule" they challenge is not a legislative rule subject to judicial review under the APA. Dkt. No. 13 at 10.

In their opposition brief, Plaintiffs disagree, arguing that although the JCE/TEA Rule cannot be cited in the Code of Federal Regulations, it (as evidenced by individual USCIS adjudications on visa petitions) is a *de facto* substantive change in longstanding agency position that rises to the level of a legislative rule. Dkt. No. 19 at 10. Plaintiffs allege that between 2015 and 2024, USCIS approved 70 EB-5 visa petitions based on investment in an NCE associated with Pacific Northwest RC, but that in 2024 it denied/revoked Darnbrough's petition and that at least four other investors' petitions have also been denied on the same grounds. Dkt. No. 9 at 12 ¶ 36,

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 9

14 ¶¶ 56–59, 17 ¶ 79.  Without providing more about the prior decisions to show that they are analogous to Darnbrough's petition and yet were decided differently, Plaintiffs present the Court with a thin record as to how USCIS's position has changed.  *See Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1146 (D.C. Cir. 2014) ("Simply identifying outcomes, stripped of their contextual analysis, falls far short of the documented record of 'express, direct and uniform interpretation' by the agency required before a fixed legal rule will be discerned." (quoting *Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944, 949 (D.C. Cir. 1999))).

For purposes of the motion to dismiss, however, if the Court assumes (as Plaintiffs' complaint pleads) that Darnbrough's petition and the other denied petitions are substantially similar, and that USCIS's position with respect to those petitions stands in stark contrast to previous adjudications, that comparison could rise to the level of a rule change reviewable under the APA.  *See, e.g.*, *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022) (where tens of thousands of visa petitions were granted, before a change in policy that led to a 20–90% drop, a court may "still evaluate whether an agency's new practice is an arbitrary and capricious deviation from prior practice and precedent, even if there had been no previous formal policy"); *Doe v. Mayorkas*, 585 F. Supp. 3d 49, 62 (D.D.C. 2022) (finding that eight prior decisions over a 10-year period was of sufficient magnitude to require the Government to explain a subsequent change in position); *Guam Contractors Ass'n v. Sessions*, No. 16-00075, 2018 WL 525697, at *1, 6–7 (D. Guam Jan. 24, 2018) (employers' applications for H-2B visas for temporary workers for years were historically approved at a rate of 95%, until suddenly USCIS began applying a different definition of key statutory terms, and approvals plummeted to a "remarkably low" rate).

None of the cases cited as support for that conclusion, however, involve an agency policy shift evident only in adjudications of individual petitions where the petitioner has failed to exhaust

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 10

her administrative remedies before filing suit, nor is the Court aware of any such case. USCIS's alleged about-face, "after an unbroken chain of approvals based on a mutual understanding with the Government of Plaintiff Green Truck's business model" (Dkt. No. 19 at 10), has occurred in the context of Darnbrough's individual adjudication that is not yet administratively final. Plaintiffs have not alleged that any of the other four revocations at issue is administratively final, either. As the Court will explain in the next section, Darnbrough's failure to exhaust her administrative remedies precludes the Court's review of a "rule"—whether legislative or interpretive—arising from the adjudication of her visa petition.

*2. Darnbrough's Failure to Exhaust Is Incurably Fatal to Plaintiffs' Claims.*

The Government argues that this action is premature in its entirety because "judicial review is only available 'at the conclusion of the [agency] proceedings.'" Dkt. No. 13 at 14 (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 33 (D.C. Cir. 2014)).

Although Plaintiffs concede that Darnbrough has not exhausted her administrative remedies, they offer a few arguments against imposing an exhaustion requirement, none of which is persuasive. First, they argue that she should not be required to exhaust because the Court should find that the USCIS has "arrived at a definitive position" with respect to the JCE/TEA Rule, and there is no indication that USCIS is open to changing its mind in the administrative appeal (so the appeal is futile). Dkt. No. 19 at 13–14 (quoting *Chinook Indian Nation v. U.S. Dep't of Interior*, 435 F. Supp. 3d 1130, 1138 (W.D. Wash. 2020)). This argument could be made with respect to nearly any unexhausted claim; Plaintiffs have not shown that an exception to the general rule applies to Darnbrough. And this argument is not persuasive here, where USCIS's reasoning has evolved with each layer of administrative review. *See* Dkt. Nos. 10-3, 10-4, 10-7. Because USCIS permits Darnbrough to submit new evidence and argument at each stage of administrative review (*see* Dkt. No. 10-7 at 10), the Court does not find that requiring exhaustion would be futile here.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 11

Second, Plaintiffs argue that the corporate Plaintiffs should not be required to exhaust because they are not parties to the pending administrative appeal in the first place. Dkt. No. 19 at 13. That is true in the sense that they have nothing to exhaust, but it is also true that the application of the JCE/TEA Rule to Darnbrough's petition is not yet final in its impact to *any* Plaintiff.[7] The corporate Plaintiffs argue that they experience ongoing harm now, even if Darnbrough's visa revocation is not yet final, because USCIS action has scared off some potential EB-5 investors and caused others to request a refund of their investment funds. *See, e.g.*, Dkt. No. 10-1 ¶¶ 42–43, Dkt. No. 10-8. The implications of a dramatic shift in USCIS policy are undoubtedly far-reaching, beyond the impact on Darnbrough and her family, but those implications do not provide an "end-run around the exhaustion requirement." Dkt. No. 20 at 7. By upholding the exhaustion requirement and "reserving judicial review until the end of an adjudication," a court "avoids disrupting the agency's processes" or "'squander[ing] judicial resources,' since the challenging party may ultimately prevail in the adjudication and have no need to appeal." *CSX Transp.*, 774 F.3d at 31 (quoting *Ciba-Geigy Corp. v. U.S. Env't Prot. Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986); *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996)). To hold otherwise would lead to duplicative proceedings here and at the agency:

> Merely because the Board's alleged adoption of a new legislative rule without notice and comment may be subject to judicial review does not mean that the court will allow CSX to pursue an interlocutory appeal. Indeed, CSX has not cited a single decision in which this or any other appellate court has permitted a party to seek interlocutory review on the ground that an agency has allegedly adopted a new legislative rule during the course of an adjudication. This comes as no surprise because the courts would wreak havoc with the final order rule were we to subscribe to CSX's position.

*Id*. at 33.

---

[7] Plaintiffs' complaint appears to bring all claims on behalf of all Plaintiffs, without delineating between individual and corporate Plaintiffs. Dkt. No. 9.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 12

Third, Plaintiffs suggest that because an exhaustion requirement was included in 2022's RIA (8 U.S.C. § 1153(b)(5)(P)(ii)), it would be unfair to apply it retroactively to Darnbrough's I-586 petition originally filed in 2019. Dkt. No. 19 at 13. The Court finds merit in the Government's argument to the contrary, that the RIA's exhaustion requirement addresses review of agency determinations, rather than review of petitions, and thus is appropriately applied to any post-RIA agency determination. Dkt. No. 20 at 4. And more fundamentally, Plaintiffs have not shown that administrative finality is a new requirement of the RIA: it is required by the APA and courts have long connected this obligation to a plaintiff's burden to show that a claim is ripe for resolution. *See* 5 U.S.C. § 704; *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation modified)); *Young v. Reno*, 114 F.3d 879, 881 (9th Cir. 1997) ("Under the doctrine of exhaustion of administrative remedies, a party may not seek judicial review of an adverse administrative decision until the party first pursues all relief within the agency."); *Adab v. USCIS*, No. 15-248 (JEB), 2017 WL 4358686, at *4–5 (D.D.C. Sep. 29, 2017) (dismissing as premature an I-526 petitioner's claim related to a USCIS notice of intent to revoke a visa petition because USCIS had not yet issued a final order on her petition). Plaintiffs have not cited authority indicating that prior to the enactment of the RIA, they would not have been required to exhaust administrative remedies before seeking judicial review. *See* Dkt. No. 19 at 13. Accordingly, Plaintiffs have not shown that to require exhaustion would require an impermissible retroactive application of the RIA.

Because Plaintiffs' claims arise from the JCE/TEA Rule, which has not yet crystallized in a final USCIS action, they all fail due to lack of exhaustion. While USCIS adjudication of Darnbrough's visa revocation is still ongoing, this action is incurably premature. *See Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) ("Ongoing agency review renders an

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 13

order nonfinal for purposes of judicial review, and a petition for review of the order is incurably premature."). Accordingly, the Court will not grant leave for Plaintiffs to amend the complaint. *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1093 (N.D. Cal. 2014) ("If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines that the pleading could not possibly be cured by allegations of other facts.").

### III.   CONCLUSION

For these reasons, the Court GRANTS the Government's motion to dismiss. Dkt. No. 13. Plaintiffs' complaint is DISMISSED without prejudice and Plaintiffs' pending motion for preliminary injunction (Dkt. No. 10) is DENIED as moot.

Dated this 15th day of September, 2025.

*Kymberly K Evanson*

Kymberly K. Evanson
United States District Judge